UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JUERGENSEN DEFENSE CORP. and
JUERGENSEN MARINE INC.,

         Plaintiffs,

                   **DECISION AND ORDER**
v.                    08-CV-959A

CARLETON TECHNOLOGIES, INC.,

         Defendant.

---

## INTRODUCTION

On December 30, 2008, plaintiffs commenced this action alleging breach of an implied-in-fact contract, breach of a Non-Disclosure Agreement ("NDA") entered in 2007, unjust enrichment, quantum meruit, promissory estoppel, breach of contract through a failure to remit payment of invoices, common-law defamation, false advertising and trade disparagement, and misappropriation of trade secrets. Along with the complaint, plaintiffs filed a motion for a preliminary injunction seeking the following forms of injunctive relief (Docket No. 5 at 30–31):

(1) Defendant [shall] be enjoined from substituting Plaintiffs' digital electronic rebreather controllers with the digital electronic rebreather controllers of third-parties or Defendant's own controllers in connection with contracts for the upgrade, maintenance, or delivery of rebreathers to the U.S. Navy;

(2) Defendant [shall] be enjoined from using, disclosing, or revealing any confidential and proprietary information belonging to Plaintiffs, including, but not limited to, Plaintiffs' trade secrets in its schematics used to create digital electronic rebreather controllers;

(3) Defendant [shall] be enjoined from making false and/or misleading statements concerning Plaintiffs' digital electronic rebreather controllers, or the design, manufacture, or quality thereof;

(4) That Defendant be required to undertake corrective measures for the false statements and misrepresentations made by Defendant concerning Plaintiffs and their digital electronic controller products, including but not limited to corrective advertising, and take any actions necessary to remedy and prevent any erroneous impression by the trade or public concerning the nature, characteristics or qualities of Plaintiffs' products arising from Defendant's statements, including but not limited to issuance of written correspondence retracting Defendant's false statements and misrepresentations made to the U.S. Navy;

(5) Defendant [shall] return to Plaintiffs any information or materials (such as schematics) belonging to Plaintiffs which are in Defendant's possession or under Defendant's control, in any format whatsoever (paper, electronic, or otherwise) and to provide certification that

Defendant has retained no other materials or copies of materials in its possession or under its control;

(6) Defendant [shall] immediately preserve any information relating to the claims at issue in this litigation;

(7) An expedited discovery timeline [shall] be set so that this matter may quickly proceed to resolution;[1] and

(8) A hearing be set for the Court's consideration on entering a preliminary injunction.[2]

The purpose of this Decision and Order is to determine whether a hearing will be necessary for each of the above requests for relief in plaintiffs' motion.

## BACKGROUND

This case concerns a piece of diving equipment called an Underwater Breathing Apparatus ("UBA"), also known as a "rebreather." A rebreather is a backpack-like device that delivers oxygen during underwater diving. Like a Self-Contained Underwater Breathing Apparatus ("SCUBA"), rebreathers allow divers to remain underwater for extended periods of time. Rebreathers are more efficient than SCUBA gear, however, because they feature a closed air circuit that

---

[1]Because expedited discovery already has occurred in this case, this request is denied as moot.

[2]This request will be considered in the context of plaintiffs' other requests.

recycles exhaled air.  Exhaled air still contains a significant amount of oxygen.  In SCUBA gear, that oxygen is lost when divers exhale the air into the surrounding water.  In a rebreather, exhaled air passes through a closed-circuit system that removes carbon dioxide, restores consumed oxygen, and presents the air to the diver again for inhalation.  A device called a controller helps divers regulate the levels of oxygen and carbon dioxide in the air circulating through the rebreather.

Defendant is a manufacturer of rebreathers.  Since approximately the 1980s, defendant has made and maintained rebreathers for the Navy under contracts awarded to it.  For years, defendant's rebreathers featured mechanical controllers.  In approximately 2002, the Navy issued revised specifications for rebreathers that required digital electronic controllers.  Around 2003, defendant and plaintiffs began working together to develop digital electronic controllers that would work with defendant's rebreathers and meet Navy specifications.  Plaintiffs are corporations that specialize in the development of rebreather technology, including digital electronic controllers.

The working relationship that plaintiffs and defendant developed over the next five years entailed a number of different activities.  Defendant, the only party in this case who had a formal contractual relationship with the Navy, would advise plaintiffs regularly about specifications that the Navy set for its rebreathers.  Plaintiffs maintain that they developed at least 12 different versions of digital electronic controllers as the Navy modified these specifications.  Plaintiffs

4

developed new hardware and software in response to the Navy's specifications. Plaintiffs spent many hours in product design, development, and testing. Plaintiffs had many meetings during the course of the working relationship with defendant's employees and potential customers, including representatives from the Navy and NATO. Plaintiffs also underwent audits from defendant and the Navy of the equipment that it was developing with defendant. In 2004 and 2007, the parties signed NDAs regarding technology that plaintiffs were developing for defendant. The 2004 NDA contained the following merger clause:

> This Agreement constitutes the entire understanding between the Parties and supersedes all previous understandings, agreements, communications, and representations, whether written or oral, concerning the treatment of proprietary information.

(Docket No. 1-2 at 5.)

The 2007 NDA contained a nearly identical merger clause:

> This Agreement constitutes the entire understanding between the parties and supersedes all other agreements express or implied between the parties regarding disclosure of the Confidential Information.

(*Id.* at 11.)

These merger clauses concerned only the disclosure of proprietary information. The parties never reduced any other aspect of their working relationship to writing.

In 2007, the relationship between the parties began to deteriorate. That year, defendant received two additional Navy contracts for rebreathers fitted with digital electronic controllers. The parties began to work together toward fulfilling

5

these new contracts.  Sometime that same year, plaintiffs began to invoice defendant $9,129.05 per controller, a higher amount that reflected additional costs for research and new materials.  Plaintiffs maintain that defendant's view of their controllers changed after the new contracts and the new invoicing.  According to plaintiffs, defendant started raising concerns about the quality of plaintiffs' controllers despite prior approval and endorsement.  Defendant contends that any prior approval concerned preliminary review of plaintiffs' controllers and did not reflect pre-production testing.  By approximately August 2008, defendant deemed plaintiffs' controllers unfit for military applications.  The relationship between the parties ceased around that time.  Plaintiffs claim that they became aware in November 2008 that defendant had made allegedly defamatory statements to the Navy about the quality of their controllers.  Plaintiffs now express concern that the timetable for delivery of rebreathers under defendant's newest Navy contracts implies an intent to disclose plaintiffs' proprietary technology for digital electronic controllers.  That is, defendant allegedly does not have time to deliver rebreathers with digital electronic controllers unless it takes the technology that plaintiffs developed over five years and either uses it internally or discloses it to another company.

    Plaintiffs commenced this action on December 30, 2008, asserting claims for breach of an implied-in-fact contract, breach of the 2007 NDA, unjust enrichment, quantum meruit, promissory estoppel, breach of contract through a

6

failure to remit payment of invoices, common-law defamation, false advertising and trade disparagement, and misappropriation of trade secrets. That same day, plaintiffs filed a preliminary injunction motion seeking the forms of relief quoted above in the Introduction.

On April 2, 2009, the parties agreed to a schedule of limited discovery in connection with the pending motion. The parties also agreed to submit supplemental briefing to address this Court's authority to grant some or all of the relief requested. The Court held oral argument on the supplemental briefing on June 24, 2009.

## DISCUSSION

### *Standard for Preliminary Injunction*

"In order to obtain a preliminary injunction, a party must demonstrate: 1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips 'decidedly' in favor of the moving party." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) (citations omitted). Additionally, "if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing

7

of, likelihood of success to obtain preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995).

### *Possession, Use, or Disclosure of Proprietary Information (Request Nos. 2 and 5)*

The second and fifth requests for relief in plaintiffs' motion relate to alleged proprietary information in defendant's possession. Through those requests, plaintiffs seek to enjoin defendant from any use or disclosure of proprietary information, and to require defendant to return materials containing that information. Plaintiffs argue that they spent five years developing at least 12 different versions of digital electronic controllers for defendant's rebreathers. These development efforts, according to plaintiffs, led to new and original technology that is proprietary. Plaintiffs' fear of use or disclosure of the supposed proprietary information stems from an inference that they make about the timetable of delivery under defendant's two newest Navy contracts. Plaintiffs claim that anyone developing digital electronic controllers from scratch would need at least as long as they did to complete a product that met Navy specifications. Defendant would miss deadlines for delivery of rebreathers to the Navy if it waited five years. Defendant, however, appears intent on delivering rebreathers this year as scheduled under the contracts. Plaintiffs infer that delivery in so short a time would be possible if and only if defendant takes

plaintiffs' proprietary information and either uses it internally for its own controller development, or shares with other contractors to accelerate their development of replacement controllers.

In opposition to this part of the pending motion, defendant contends that plaintiffs' inference about likely use or disclosure has no factual basis. According to defendant, digital electronic controllers are not a concept unique to plaintiffs. In fact, defendant asserts that it has developed its own digital electronic controller technology without any reference to any proprietary information from plaintiffs. Defendant maintains that it developed its own controllers simply by reviewing the Navy's specifications and building from scratch.

The factual disputes that surround the issue of proprietary information require a hearing for resolution. "On a motion for preliminary injunction, where essential facts are in dispute, there must be a hearing . . . and appropriate findings of fact must be made." *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir. 1987) (internal quotation marks and citations omitted). The parties have not specified what proprietary information might be in question. They disagree over plaintiffs' inference about the timetable for delivery of rebreathers to the Navy. They disagree further about defendant's—or any company's—capacity to make digital electronic controllers from scratch. Resolving these questions will be critical to determining whether plaintiffs face irreparable harm and what the scope of any injunction might be. The Court thus

orders a hearing regarding the second and fifth requests in plaintiffs' motion.  The Court reserves decision on these requests pending the conclusion of the hearing.

### *Defamation (Request Nos. 3 and 4)*

The third and fourth requests in plaintiffs' motion relate to alleged defamation.  Plaintiffs allege that after their relationship with defendant deteriorated, defendant made certain false and defamatory statements to third parties, including the Navy, about plaintiffs' products.  "Specifically, among other things, Plaintiffs were informed that the U.S. Navy had decertified Plaintiffs' digital electronic rebreather controllers due to Defendant's false assertions [about quality and/or manufacture]; that Defendant was attempting to fulfill the U.S. Navy contracts with alternate digital electronic rebreather controllers; and that they were attempting to design and manufacture such digital electronic rebreather controllers without subcontractor assistance, the first of which would be delivered by April 2009."  (Docket No. 5 at 13.)  Plaintiffs seek to enjoin defendant from making any future false or defamatory statements and to require defendant to correct past statements.

In opposition to this part of plaintiffs' motion, defendant denies that any statements that it made to the Navy were defamatory.  Defendant claims that any statements that it made to the Navy regarding the quality of plaintiffs' products were accurate and truthful.  These statements allegedly stemmed from pre-production testing of plaintiffs' controllers that revealed hardware and software

problems. The problems allegedly would have put defendant's rebreathers out of compliance with Navy specifications. According to defendant, it relayed this information to the Navy in straightforward fashion without adding any defamatory content. Nevertheless, defendant has offered "to enter into a stipulated order providing that, during the pendency of these proceedings, its employees, officers, and agents will make no statements, whether written or oral, to any third-parties regarding plaintiffs, their products, their processes, and/or their technology." (Docket No. 32 at 12.) Defendant has made this offer in a good-faith effort to reduce the number of issues in contention in this case.

In light of defendant's offer of stipulation, the Court finds that plaintiffs' third and fourth requests should be denied. Moreover, even absent that stipulation, injunctive relief would be inappropriate for these requests. Plaintiffs essentially are asking for a restraint on defendant's speech. "It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication . . . . No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices . . . warrants use of the injunctive power of a court." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418–20 (1971); *see also Am. Malting Co. v. Keitel*, 209 F. 351, 354 (2d Cir. 1913) ("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States . . . . If the publications . . .

are false and injurious, [plaintiffs] can prosecute the publishers for libel.") (internal quotation marks and citations omitted). Plaintiffs' remedy here is legal and not equitable.

### *Specific Performance (Request No. 1)*

The first request in plaintiffs' motion relates to the daily working relationship that they had with defendant from 2003 to 2008. Plaintiffs seek to enjoin defendant from breaching what they describe as an implied-in-fact contract establishing "that Plaintiffs would be the sole supplier of the digital electronic controller technology to be used in any upgraded rebreathers provided under any such military contracts." (Docket No. 6 ¶ 14.) Plaintiffs contend that their working relationship rested on promises of mutual non-competition through many stages of product design and development. Plaintiffs contend further that their partnership with defendant helped defendant acquire its latest two contracts from the Navy. Under these circumstances, plaintiffs argue, defendants should not reap the benefits of plaintiffs' many hours of work creating a unique product that served only one market.

In opposition to this part of the motion, defendant asserts that plaintiffs were suppliers only, not partners, and that no organized working relationship existed. Additionally, defendant contends that plaintiffs are free to sell their controllers to other purchasers and are not cut off from access to any market by defendant's termination. Finally, defendant contends that plaintiffs are

12

exaggerating the importance of defendant's most recent Navy contracts. According to defendant, plaintiffs have admitted to selling roughly 2,000 civilian controllers over the last three years, a sales figure approximately 400% higher than the number that they would have sold under defendant's most recent Navy contracts.

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered. To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. And, irreparable harm must be shown to be actual and imminent, not remote or speculative." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted).

Here, plaintiffs have alleged wrongful termination of their working relationship with defendant. The termination occurred last year, and was a single event that is not ongoing in nature. Although plaintiff claims that the wrongful termination has resulted in missed opportunities for them to sell their controllers to the Navy, monetary damages are the appropriate remedy, not equitable relief. Plaintiffs stated that, as of November 2007, they were invoicing defendant $9,129.05 for each controller. The invoice amount establishes that quantifying

13

the value of the controllers is possible.  At trial, plaintiffs could submit evidence estimating the number of controllers that they might have sold under the two contracts that defendant won from the Navy in 2007.  Because monetary damages provide plaintiffs with an adequate remedy at law to redress this harm, the first request in their motion must be denied.

The first request in plaintiffs' motion is problematic for another reason.  Plaintiffs essentially are asking this Court to require defendant to resume its day-to-day relationship with plaintiffs.  Such relief is excessively vague and speculative.  "The embodiment of an intricate relationship between plaintiff and defendant . . . militates against specific performance.  Where a contract governs such an ongoing relationship, a grant of specific performance could require the courts to supervise the . . . relationship over the length of plaintiffs' lifetime, a task for which courts are poorly suited."  *Litho Prestige v. News Am. Pub., Inc.*, 652 F. Supp. 804, 809–10 (S.D.N.Y. 1986) (internal quotation marks and citations omitted).  This working relationship entailed meetings, audits, design activities, and testing over the course of five years.  These activities, in turn, almost certainly entailed countless conferences, memoranda, email messages, telephone calls, document exchanges, and other types of daily communications.  In the absence of any written agreement whose concise, particular terms could be enforced, the entirety of the parties' daily activities would fall under the scope of any injunction that the Court issued.  It would be impossible for any order of

this Court to articulate with any specificity what is meant by an injunction requiring the parties to re-establish their working relationship. Further, any injunction that vaguely enjoined defendants from "breaching its contractual obligations" would fail to put defendant on notice as to the specific conduct required or prohibited and would run afoul of the requirement that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document-—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see also Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1111 (2d Cir. 1980) ("A court is required to frame its orders so that those who must obey them will know what the court intends to forbid. Basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed . . . . An order which does not satisfy the requirement of specificity and definiteness will not withstand appellate scrutiny.") (internal quotation marks and citations omitted). This is especially true where, as here, plaintiffs seek to enforce the terms of an unwritten contract. The first request in plaintiffs' motion must be denied for this reason as well.

### *Preservation of Relevant Information (Request No. 6)*

The sixth request in plaintiffs' motion relates to spoliation. Plaintiffs seek an injunction requiring that defendant "immediately preserve any information

15

relating to the claims at issue in this litigation." This request needlessly would repeat the general obligation that both sides in this case already have to preserve evidence. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted). Here, both sides have submitted pleadings and motion papers that relate to plaintiffs' claims. Both sides have conducted limited discovery to explore the basis for plaintiffs' claims. By now, each side should be fully aware of how the other views this case and what information might be relevant to those views. Both sides, therefore, are required already to preserve any information that might be relevant to the claims and defenses in this case. Under these circumstances, the Court will not take additional action against only one side without evidence that spoliation actually has occurred. The sixth request in plaintiffs' motion thus is denied.

**CONCLUSION**

For all of the foregoing reasons, the first, third, fourth, and sixth requests for injunctive relief in plaintiffs' motion are denied. With regard to the second and fifth requests, an evidentiary hearing is necessary to address whether defendant is in possession of any of plaintiffs' proprietary information and, if so, whether injunctive relief is necessary to prevent the use or disclosure of that information.

The parties are directed to appear before the Court on **Thursday, August 13, 2009 at 9:00 a.m.** for a status conference to set a hearing date.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED: July 20, 2009